**Kathleen BUCCI**

v.

**BLUE CROSS–BLUE SHIELD OF CONNECTICUT, INC.**

Civ. No. 2:91 CV 00173 (PCD).

United States District Court,
D. Connecticut.

March 8, 1991.

with Willett. *See Williams, supra,* 588 F.Supp. at 1046–47.

Timothy W. Donahue, Patrick M. Noonan, Delaney, Zemetis, Donahue, Durham & Noonan, P.C., Wallingford, Conn., for defendant.

Richard D. Carter, Douglas M. Coleman, Hudgins, Carter & Coleman, Alexandria, Va., Peter C. Mlynarczyk, Law Offices of Howard H. Belkin, New Britain, Conn., for plaintiff.

## MEMORANDUM OF DECISION

DORSEY, District Judge.

### Procedure

Plaintiff commenced this action in the Connecticut Superior Court from which defendant removed it as authorized by 28 U.S.C. § 1441. Jurisdiction is grounded in 28 U.S.C. § 1331, as the case presents a federal question under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The demonstrated necessity of resolving the complaint before further deterioration of plaintiff's advanced medical condition renders the question presented moot, has resulted in the earliest possible trial assignment, and the parties'. presentation on the merits for a final determination.[1] The matter was expedited such that the issues were framed solely by the complaint as defendant did not have the opportunity to file an answer.

### Issue

Undisputedly, plaintiff is a covered party within the policy of health insurance issued by defendant. Exhibit 1. Thus, she is entitled to payment for medical treatment she receives, subject to the policy terms. Defendant raises only one ground on which it based its denial of benefits—that the procedure recommended by her doctors is experimental. The policy provides,

[defendant] will not pay for services ... which are experimental or investigational in nature; meaning any treatment, procedure ... drugs, drug usage ... not recognized as accepted medical practice or not recognized by us....

The disqualifying phase, "which are experimental or investigational in nature" thus has no independent meaning for it is defined by the phrase "not recognized as accepted medical practice." Defendant agreed that the phrase "or not accepted by us," although conjunctive, was not intended to introduce an independent criteria but was intended to articulate defendant's retention of the authority to decide benefit entitlement. Thus, defendant denied entitlement on the ground that Mrs. Bucci's procedure is not recognized as accepted medical practice.

Next the standard of review must be determined. If the plan administrator[2] has retained the discretion to determine entitlement, then its decision is reviewed under an "arbitrary and capricious" standard, otherwise it is reviewed on a de novo basis. The former is not favored, for "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the bene-

1. Counsel are to be complimented on the quality of the presentation in the face of the short time to prepare.

2. The parties agree this is an ERISA plan and thus that Act's standard of review is to be applied.

fit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Nonetheless, if an administrator is operating under a conflict of interest such as where, as here, an unfunded plan is involved, that circumstance must be considered in the review. *Id.; Adams v. Avondale Indus., Inc.,* 712 F.Supp. 1291, 1295 (S.D.Ohio 1989).

Ambiguities in the plan should be resolved against the insurer. *Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 702, 569 A.2d 1131 (1990). "If there are ambiguities in the contract, the court must prefer the interpretation which will sustain the claim." *McCauley Enterprises v. New Hampshire Ins. Co.,* 716 F.Supp. 718, 720 (D.Conn.1989).

*Facts*

■ In February 1988, plaintiff was diagnosed as having breast cancer, for which she underwent a modified radical mastectomy, followed by a nine-month course of low dose chemotherapy ("LDCT"). She appeared then to be free of cancer cells, but reexamination in January 1990 revealed metastasis to bones. She was thereupon treated with LDCT and radiation therapy until August 1990, when the disease was found to have progressed.

The response of cancer cells to chemotherapy is proportional to the dosage applied. High dosage chemotherapy ("HDCT") is thought to be a logical extension of LDCT as a treatment for cancer, including breast cancer. However, beyond certain dosages, chemotherapy tends to destroy bone marrow, in turn impairing the body's immunity system and rendering the patient vulnerable to infection. A process developed, and used, independent of cancer treatment, involves the extraction of bone marrow from a patient, screening it for, among other things, cancer cells, preserving it, and then replacing it in the patient's body to maintain adequate immunity function. This process is known as an autologous bone marrow transplant ("ABMT").

Combination of the two regimens, ABMT and HDCT, has been applied to other forms of cancer and has come to be prescribed for use in the treatment of breast cancer for certain patients, specifically those whose disease has progressed to stage IV and has not been stemmed by other, less radical treatment. *See Dozsa v. Crum & Forster Ins. Co.,* 716 F.Supp. 131, 133 (D.N.J.1989). Under a protocol described by Dr. William P. Vaughn, Exhibit 3(D), an oncologist of unquestioned qualification, Exhibit 5, HDCT/ABMT has been recommended to plaintiff by her treating oncologist, by Dr. Vaughn, and by oncologists at Dartmouth–Mary Hitchcock Medical Center. HDCT/ABMT has been used only recently and is not reduced to a single regimen. *See* Exhibit H at 2; Exhibit 6 at 6. Its results have been assessable from a limited number of cases. In 1988–89, some 800–900 cases were treated with the regimen. Time is required to determine the effects on patients. The procedure does have a morbidity rate, from the procedure itself, of 10–20%. On a more positive note, a partial response and a complete response is achieved at rates which exceed the rates of response to LDCT alone, the only alternative treatment, when provided to those patients who are in extremis having exhausted the LDCT regimen without stemming the spread of the cancer. It is these latter patients who would be considered for the HDCT/ABMT treatment as a last resort. Such patients are not expected to survive but for short time. Patients who still have detectable cancer cells after the treatment, but nonetheless realize either a palliation of symptomatology or some limited extension of their life expectancy, are described as partially responsive. Those who have no detectable cancer cells after the treatment are described as completely responsive, but that may be the case for only a limited time. Plaintiff's evidence suggests the following as the comparable experience for stage IV breast cancer patients:

|  | Continued LDCT | HDCT/ABMT |
|---|---|---|
| Complete Response | 10–20% | 59% |
| Partial Response |  |  |
| Disease free for 2 years | 0% | 20–30% |

The evidence varied in this regard but lack of conclusive improvement is not controlling, since the question is acceptance of HDCT/ABMT. HDCT/ABMT is viewed as intended to cure the disease. That result cannot be guaranteed. LDCT, on the other hand, is not viewed as curative because there is no realistic likelihood of its achieving a complete response in patients such as Mrs. Bucci, except in a small number of cases.

The foregoing forms the basis for her experts' claim that, although the advantages to her are not established by an overwhelming number of cases in which the treatment has been tried and measured, there is enough experience to support their opinion of the medical efficacy of the treatment. In part, that view is formed because of the circumstances of patients such as Mrs. Bucci, for whom continued LDCT offers mere symptom palliation and only slight improvement in some patients' life expectancy. Although not unequivocal, doctors have expressed acceptance of HDCT/ABMT. *See* Exhibit 7. That the process continues to be evaluated does not bar acceptance.

In contrast, defendant argues, and offers medical opinion that the experience with the proposed regimens is too limited, it has been used in too few cases to permit a meaningful assessment of its efficacy. Defendant notes the care it takes in evaluating procedures for payment by highly qualified committees, whose judgment is accepted. It is also true that the small number of cases cited by Dr. Vaughn, *see* Exhibit 3C at 10–11, are a questionable basis, statistically, from which to draw unequivocal conclusions. Positive responses were limited. Defendant also cites the high morbidity reported. Plaintiff counters with the fact that LDCT must continue to death in stage IV cases while HDCT/ABMT offers a period of freedom from treatment.

Defendant applies a five-factor Technical Evaluation Criteria ("TEC"). Exhibit. 8. Its evidence was that none of the criteria are met by Dr. Vaughn's proposed regimen. The TEC is not incorporated in nor referred to in the policy. Exhibit 1. Summarized, the criteria are (1) government regulatory approval; (2) evidence which permits conclusions as to the effect on patient health; (3) demonstrated improvement of the patient's health; (4) demonstration of medical benefit at least equal to that offered by established alternative treatment; and (5) improvement other than in investigational settings. Defendant pays for HDCT/ABMT as accepted for several forms of cancer using TEC.

*Discussion*

A. Standard of Review

As the plan does give to the defendant the "discretionary authority to determine eligibility for benefits," defendant's denial will be reviewed as to whether it was arbitrary and capricious, allowing for consideration of the fact that any benefits would not be paid out of committed funds but out of defendant's general funds. *Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. at 956–57.

B. Propriety of Defendant's Denial

Defendant must determine benefit entitlement subject to the ERISA purpose of "promot[ing] the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) and "protect[ing] contractually defined benefits." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). Defendant's denial has been proven to have been arbitrary and capricious for the following discussed reasons.

■ Defendant was shown to have been made aware of the assertion that 38 health insurers have committed to the University of Nebraska, Exhibit 3(I), and 32 insurers (mostly the same ones) have committed to Duke University, Exhibit 3(H), to provide benefit coverage for HDCT/ABMT treatment. While the regimens thus approved were not shown to be precisely the same as that prescribed for Mrs. Bucci and the insuring language was not shown to have been precisely the exclusionary language in defendant's policy, the issue presented is deemed sufficiently likely to have been comparable to have obliged defendant to have inquired of the insurers in question.

The body of medical acceptance which prompted a substantial number of insurers to accept the treatment as covered, under whatever criteria was applied by them, is deemed reasonably likely to have been relevant to whether there was substantiation for Mrs. Bucci's treatment being considered experimental or not experimental. Defendant's acting without making such inquiry suggests an arbitrary and capricious denial—that is, one made without all reasonably relevant inquiries. It is recognized that this information was not available to defendant until January 1991. Normally, a review is made on the basis on which defendant acted. As defendant's duty to provide benefits is a continuing one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against the information available from time to time. The information is not static, but is developing. Defendant had the opportunity prior to trial to make the further inquiry. To refuse to consider its failure would allow plaintiff to seek review of another denial then including consideration of the failure.

Defendant's reliance on the TEC is not valid. The first consideration, government approval, is not applicable, as none is required except for the drugs used, which have been approved, although not specifically in HDCT.

■ The second, third, and fourth are subjective in nature. They are not applicable in any measurable, objective sense. As relied on by defendant, they reflect the essence of defendant's position, that in the absence of a sufficient body of evidence demonstrating the effectiveness of the procedure in providing substantial medical benefit to patients, it was proper to find the procedure not recognized as accepted medical practice. The policy sets no standard by which that acceptance is to be measured. Should it then be reasonable, substantial, responsible or other such imprecise standard? If the standard used is to be regarded as anything other than arbitrary and capricious, a procedure may be found not to constitute accepted medical practice only where there is no reasonably substantial, qualified, responsible, relevant segment of the medical community which accepts the procedure as properly within the range of appropriate medical treatment, under the circumstances of the case, as judged by the standards of the medical community. Much as in a malpractice setting, if the contemporary standards of the medical community would deem the treatment applied or used in the circumstances of the particular case, as consistent with the exercise of medical judgment, in the view of a reasonable number of practitioners qualified to treat the malady in question, then the treatment must be found to be accepted medical practice. If such were the case, then a finding that the treatment was not so accepted could only be arbitrary and capricious.

Applying such a test here, it is clear that the treatment is not faulted as in any way contrary to sound medical practice. It is logical, scientifically. It involves a significant risk of death, but not extremely disproportionate when leaving the patient with only LDCT places the patient in an almost certain risk of death within a very short time. To a reasonable, qualified number of practitioners, if one extrapolates from the opinion, reasoning and testimony of plaintiff's doctors, there is evidence which would permit conclusions as to the benefit from the treatment, that a reasonable likelihood of benefit to Mrs. Bucci's health will result, and that there is no alternative treatment which would provide any greater likelihood of medical benefit to her. Further, there is no evidence that such is not the case under any one of the three criteria of TEC. There was evidence that there was not sufficient medical substantiation, from case studies, that the three criteria were met. However, that testimony was founded on an undefined level of acceptance. To permit defendant to base a denial on the lack of cases of such treatment which it regards as sufficient to prove the efficacy of the treatment, when the number it would accept as sufficient is not ascertainable from the language of the policy nor testified to, would permit an arbitrary and capricious denial. Defendant has not shown nor claimed the treatment to be in violation of any standards. Indeed, in the treatment of several forms of cancer, it provides benefits. *See Dozsa*, 716 F.Supp.

at 136 (Per defendant's consultant: "In a way ... we are really splitting hairs in the sense that once one accepts ABMT as a technique for one indication it is a short way to accepting it for all of the non-solid tumors."). Further, in a somewhat modified form, defendant is prepared to permit the treatment at another facility as an experiment, paying for it not as an obligation to plaintiff but in furtherance of the medical exploration of its efficacy. As plaintiff has shown enough to warrant HDCT/ABMT being found to be accepted, it is found to have been denied, using an arbitrary and capricious standard. The denial occurred without a defined, validated, justifiable standard such as the number of cases, allowing for uncertainty as to the results reported, which would be required before acceptance would have been shown. Under defendant's theory, whatever number its experts selected, without any obligation to justify the minimum number required, it could deny benefits with impunity. Such an imprecise standard would permit no meaningful review, even under the deferential standard applied here. Denial by application of such a standard cannot be other than arbitrary and capricious and cannot stand. What defendant has attempted to do is to deny benefits on the ground that the procedure is not accepted when measured against a standard which is not defined in the plan and which has not been justified under ERISA. Thus, the standard on which defendant claims the right to rely is a floating standard which can rise or fall in any fact situation. As not reviewable against identifiable criteria, and here not justified by testimony similarly reviewable, the denial lacks support. Dr. Rappaport did not point to the policy nor testify as to the level of data which would be enough, i.e., a "particular test, or ... a particular threshold of statistical success in terms of a cure or survival rate," *Pirozzi v. Blue Cross–Blue Shield of Virginia,* 741 F.Supp. 586, 590 (E.D.Va.1990),[3] the justification for which could be found in

either the plan language or statutory purpose. Finding the denial to have been arbitrary and capricious is buttressed by the fact that the denial avoids a direct expense to defendant, not merely an allocation of committed funds and by the firm, reasonable and logical testimony of plaintiff's two well-qualified oncologists. The denial was based essentially on an advisory comittee's[4] recommendation explained only by Dr. Rappaport's testimony that there was insufficient data from an adequate number of cases in which the procedure was used.

*Conclusion*

For the foregoing reasons, judgment shall enter for plaintiff, finding that defendant's denial of the requested benefits was arbitrary and capricious and that defendant is obliged to provide benefits for the prescribed treatment for Mrs. Bucci subject to the reasonableness test applied to medical bills. Defendant's immediate obligation is to pre-certify the treatment as covered.

SO ORDERED.

---

3. Defendants distinction of *Pirozzi* as a case of denial based solely on TEC criteria is not entirely valid, since Dr. Rappaport, in his testimony, was led through the five TEC criteria and suggested his view considered the failure of Dr. Vaughn's procedure to meet all five.

4. The committee consisted of two oncologists, neither of whom testified in court, and two bone marrow transplant experts.