**Katherine WHITNEY, as Executrix of the Estate of Barbara Whitney, Plaintiff,**

v.

**EMPIRE BLUE CROSS AND BLUE SHIELD, Defendant.**

**No. 93 Civ. 0299 (RWS).**

United States District Court, S.D. New York.

March 19, 1996.

Mark Scherzer, New York City, for Plaintiff.

Jeffrey D. Chansler and Joyce Tichy, New York City, for Defendant.

## OPINION

SWEET, District Judge.

This case presents the issue whether High Dose Chemotherapy ("HDC") followed by Autologous Bone Marrow Transplantation ("ABMT") is a covered treatment for advanced metastatic breast cancer under a Tradition Plus Hospitalization Policy (the "Poli-

cy") issued by defendant Empire Blue Cross & Blue Shield ("Empire") to plaintiff, decedent Barbara Whitney ("Whitney"). Empire rejected coverage of Whitney's treatment on the ground that HDC/ABMT for breast cancer was "experimental" or "investigational" under the terms of the Policy. After a trial before the Court and upon the findings and conclusions set forth below, judgment will be entered in Whitney's favor.

### Parties

Plaintiff Whitney was a resident of Brooklyn, New York and was covered at all relevant times, through her death, under a Tradition Plus Hospitalization Policy issued by defendant Empire.

Defendant Empire is a hospital services corporation formed under Article 43 of New York's Insurance Law with offices in Manhattan.

### Prior Proceedings

The complaint in this action was filed on January 19, 1993. Whitney died in July 1993 and her daughter, Katherine Whitney, was substituted as executrix of Whitney's estate, by order of the Court dated December 14, 1993.

Discovery proceeded through 1994. In order to accommodate the schedules of the five [1] physician experts, the trial was heard over the course of almost eight months: February 6, April 19 and 21, May 8, and September 13–14, 1995. The parties briefed the case extensively post-trial. Oral argument was heard three months after the final witness on December 12, 1995 and the trial was considered complete at that time.

### Facts

Whitney was first diagnosed with breast cancer in 1982. At that time she had a bilateral radical mastectomy and achieved a complete remission. The cancer recurred in April 1992. She was categorized as a Stage IV metastatic breast cancer patient; the breast cancer had spread to her bone and lung. She was 55 years old at the time.

Whitney was treated with Tamoxifen without response. That treatment was discontinued in July 1992. Subsequently she underwent several rounds of Conventional Dose Chemotherapy ("CDC"): first, three cycles of Cytoxan, Methotrexate, and 5–Flouruoracil; then, twenty-one cycles of Mitoxantrone. Finally, in January 1993, she underwent a five-day continuous infusion of Velban. Whitney's cancer progressed. Whitney was experiencing bone pain, difficulty breathing and required oxygen. At this point, her treating oncologist, Dr. Margaret Lewin, recommended that she be enrolled in a treatment program consisting of High Dose Chemotherapy with autologous bone marrow transplant or stem cell support ("HDC/ABMT") [2].

Whitney was covered at all relevant times under a Tradition Plus Hospitalization Policy (the "Policy") issued by Empire. The Policy was a group policy issued to Whitney's em-

---

1. In the end, only four physicians testified in Court. The fifth, Dr. Bensinger, was presented via trial deposition. His schedule was considered repeatedly, however, in scheduling witnesses.

2. HDC treatment is:

"[A] procedure by which bone marrow [or peripheral stem cells] is extracted from the patients body, frozen, and stored while the patient receives large, near lethal doses of chemotherapy. In some cases the chemotherapy is administered in doses in excess of one thousand times the standard dose. This high dose chemotherapy kills not only the cancer, but much of the patient's bone marrow as well. This secondary effect, untreated, could well be lethal to the patient. Thus, after the chemotherapy is completed, the patient's stored bone marrow [or peripheral stem cells] is returned to the patient's body to replace the damaged bone marrow and thereby 'rescue' the patient."

*Pirozzi v. Blue Cross–Blue Shield of Virginia*, 741 F.Supp. 586, 591 at 588 (E.D.Va.1990).

An autologous bone marrow transplant, or ABMT, refers to the removal of one's own bone marrow and then, subsequent to HDC treatment, the reinfusion of that bone marrow to replace and reconstitute the marrow destroyed as a side effect of the treatment.

Peripheral stem cell support, or PSCS, refers to the collection of "stem cells"—the progenitor or parent of all other red and white blood cells—from outside the marrow, and then, as with ABMT, the reinfusion of those cells as seeds for the regrowth of the bone marrow.

The term ABMT will be used to describe the procedure whether stem cells or the marrow itself are being transplanted.

ployer. It was an "employee welfare benefit plan" subject to and governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C.A. § 1001 ("ERISA") (1985).

On February 4, 1993, Whitney was evaluated at the Fred Hutchinson Cancer Research Center (the "Hutchinson Center") for enrollment in a High Dose Chemotherapy treatment program by Dr. William I. Bensinger ("Bensinger").

Whitney's prognosis at the time of her admission to the Hutchinson Center was that her life expectancy was "a matter of a month or so." There was general consensus among the experts that further CDC treatment was unlikely to have any significant effect. According to Empire's Medical Director, Marvin Blitz, M.D. ("Blitz"), the primary alternative to HDC treatment was "a hospice program" with "more pain medication" and "more oxygen,"—"[a]cceptance of the inevitable."

On February 10 through 12, her stem cells were collected for later transplantation. On February 13 and 14, 1993, Whitney received intermediate dose chemotherapy as an "induction" treatment to improve her performance status, test her response, and assess her eligibility for the proposed HDC treatment. She experienced a "pretty good" response to the treatment and was referred for the HDC/ABMT procedure. A transfer note dated March 2, 1993 indicated that Protocol 779.0 involved at least a 10% mortality and an unknown degree of morbidity.

From March 4 through March 10, 1993, Whitney received her prescribed HDC treatment, consisting of the chemotherapeutic agents Busulfan, Melphalan, and Thiotepa. On March 12, 1993, Whitney received an autologous transplant of previously-collected peripheral stem cells. Both the IDC and HDC treatments were administered to Whitney pursuant to protocols approved by the Hutchinson Center's Investigative Review Board—Trial 779.0.

Whitney was discharged on April 2, 1993, under the continuing care of the Hutchinson Center's outpatient department. On April 3, 1993, Whitney was discharged from the Hutchinson Center's outpatient department into the care of her oncologist, Dr. Lewin.

Whitney was described by Dr. Bensinger as having had a substantial response to the treatment, with "significant improvement in her symptomatology." This included that she was no longer bedridden, that she didn't require oxygen and that she was pain free for a number of months. Her MRI results from the end of May showed substantial improvement in the "areas of consolidation in the lung tissue and marked reduction in the amount of pleural fluid in the chest" compared with pre-treatment studies.

Whitney's daughter Katherine observed that her mother had absolutely benefitted from the treatment. The record shows disagreement between the experts as to exactly which treatment caused her improvement, but there was improvement in her symptoms and condition.

Despite signs of improvement, however, Whitney's cancer progressed and on July 16, 1993 she died.

On December 30, 1992, prior to Dr. Bensinger's commencement of HDC/PSCS treatment in February 1993, the Hutchinson Center sought pre-certification from Empire for the treatment. On December 31, 1992 Empire denied this request for coverage by notation on a pre-authorization form.

On January 15, 1993, Whitney, by her attorney, challenged Empire's determination and stated her intention to file a complaint to enforce her rights under the policy and to seek a preliminary injunction.

Empire's denial was confirmed by letter dated January 19, 1993. Empire refused coverage on the ground that HDC/ABMT "is considered to be experimental or investigational in the case of carcinoma of the breast." The letter neither discussed the particulars of Whitney's condition nor suggested that the treatment was established but medically unnecessary in Whitney's case. The Medical Director of Empire makes the final decision about what is exempt from coverage under the experimental exception.

Also on January 19, Whitney served a complaint on Empire. By stipulation and reservation of rights, also dated January 19,

1993, Empire paid the costs of Whitney's treatment.

The Experimental Exclusion, relied on by Empire to deny coverage, states, in relevant part:

> Unless otherwise required by law ... we will not cover any treatment ... if, in our sole discretion, it is not medically necessary in that such technology is experimental or investigational. Experimental or investigational means that the technology is:
>
>> 1. not of proven benefit for the particular diagnosis or treatment of the Covered Person's particular condition; or
>>
>> 2. not generally recognized by the medical community as reflected in the published peer-reviewed medical literature as effective or appropriate for the particular diagnosis or treatment of the Covered Person's particular condition.
>
> We will also not cover any technology or any hospitalization in connection with such technology if, in our sole discretion, such technology is obsolete or ineffective and is not used generally by the medical community for the particular diagnosis or treatment of the Covered Person's particular condition.
>
> Governmental approval of a technology is not necessarily sufficient to render it of proven benefit or appropriate or effective for a particular diagnosis or treatment of the Covered Person's particular condition. We may apply the following five criteria in exercising our discretion and may in our discretion require that any or all of the criteria be met:
>
>> 1. any medical device, drug or biological product must have received final approval to market by the United States Food and Drug Administration for the particular diagnosis or condition. Any other approval granted as an interim step in the FDA regulatory process, e.g., an Investigational Device Exemption or an Investigational New Drug Exemption, is not sufficient. Once FDA approval has been granted for a particular diagnosis or condition, use of the medical device, drug or biological product for another diagnosis or condition may require that any or all of the five criteria be met.
>>
>> 2. conclusive evidence from the published peer-reviewed medical literature must exist that the technology has a definite positive effect on health outcomes; such evidence must include well-designed investigations that have been reproduced by nonaffiliated authoritative sources, with measurable results, backed up by the positive endorsements of national medical bodies or panels regarding scientific efficacy and rationale.
>>
>> 3. demonstrated evidence as reflected in the published peer-reviewed medical literature must exist that over time the technology leads to improvement in health outcomes, i.e., the beneficial effects outweigh any harmful effects.
>>
>> 4. proof as reflected in the published peer-reviewed medical literature must exist that the technology is at least as effective in improving health outcomes as established technology, or is usable in appropriate clinical contexts in which established technology is not employable.
>>
>> 5. proof as reflected in the published peer-reviewed medical literature must exist that improvement in health outcomes, as defined in paragraph 3, is possible in standard conditions of medical practice, outside clinical investigatory settings.

Empire declined to cover Whitney's treatment based upon its view that the treatment was experimental because: it was provided pursuant to a Phase I research protocol;[3]

---

[3] Phase I, II, III, and IV clinical trials refer to a progression of standardized experiment formats employed by the FDA for the purpose of testing drugs in human patients. Phase I studies are geared towards determining a treatment's dose-limiting toxicities, and usually involve a spectrum of diseases and dose levels. Phase II studies are designed to assess efficacy, and usually involve a scheduled dose given to patients with a defined disease and clinical status. Phase III studies are designed to compare the efficacy of a treatment to that of standard treatment by "randomizing" patients with a defined clinical status into one treatment arm or the other. Phase IV "post-marketing" studies are designed to collect additional information about a treatment.

the protocol was under the supervision of an IRB; Whitney was required to review and sign an informed consent advising her of the unproven nature of the treatment; the objective of the study was to determine the maximum tolerated dose of a particular drug combination, rather than to provide effective therapy; the drug dosages were incrementally increased as among small groups of patients; patients with varying cancers were treated under the protocol; and that the drug regimen used had not been tested in any patients before.

The cost of HDC/ABMT is estimated to be between $80,000 to $200,000, a cost that would be deemed "expensive" in Empire's view. Blitz, the Medical Director at Empire, admitted that higher cost treatments are more likely to be evaluated by Empire pursuant to the Experimental Exclusion, than small cost items. While this decision alone is not arbitrary, the variation in the stringency with which various treatments are reviewed to make this determination, as discussed further below, is arbitrary.

Blitz further testified that because of the high incidence of breast cancer—between 175,000 and 200,000 new cases per year— even relatively inexpensive treatments can add up to a substantial cost.

Empire has covered HDC/ABMT as a non-experimental treatment for multiple myeloma, a form of cancer affecting blood plasma cells and the bone marrow, since the latter part of 1993. Multiple Myeloma is a relatively rare form of cancer.[4]

### DISCUSSION

While this case presents the reasonableness of a fiduciary's interpretation of contract provisions, it is set in a complex set of circumstances. Obviously the need to make "rational" health care policy has been the obsession of this country for decades. The debate has centered around the desirability of providing health care for as many people as possible in a fiscally sound manner. At the same time, we are a society obsessed with not dying. While framed as an ERISA review, this case is about the impossible contradiction between these strong societal obsessions.

As Psychiatrist Willard Gaylin noted during the recent national health care debate:

> What is needed is a "wide-open far-ranging public debate" about the deeper issues of health care—our attitudes toward life and death, the goals of medicine, the meaning of health, suffering versus survival, who shall live and who shall die (and who shall decide).

Annas, George J., *Reframing the Debating on Health Care Reform by Replacing our Metaphors,* New Eng.J. of Medicine, 332: 744, 746 (1995) (quoting Gaylin, W., *Faulty Diagnosis: why Clinton's Health–Car Plan Won't Cure what Ails Us.,* Harpers, October 1993.)

The need for such a debate is no less necessary in the specific arena of cancer treatment. The courts are not the appropriate forum for this debate. Yet the courts are forced to resolve these questions of survival and over-valued treatment. Many other courts have addressed similar issues; many dealing directly with the issue of the "experimental" nature of HDC/ABMT for the treatment of Stage IV breast cancer.[5] Those

---

4. In *Schnitker v. Blue Cross/Blue Shield of Nebraska,* 787 F.Supp. 903 (D.Neb.1991) the Court found that the annual incidence of Multiple Myeloma in the United States is roughly 8,000 cases.

5. For example, decisions supporting coverage include: *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379 (11th Cir.1993), *cert. denied,* 114 S.Ct. 440, 126 L.Ed.2d 374 (Stage IV breast cancer: "medically necessary" defined as "in accord with accepted standards of community practice; ... not considered experimental; and could not have been omitted without adversely affecting the insured person's condition"); *White v. Caterpillar, Inc.,* 765 F.Supp. 1418 (W.D.Mo. 1991), *aff'd,* 985 F.2d 564 (8th Cir.1991) (Stage

IV breast cancer: arbitrary and capricious for administrator to rely on 5–year old DATTA report when the policy stated that such reports would be used only as a "guide" to determine whether a treatment is "generally accepted"); *Frendreis v. Blue Cross Blue Shield of Michigan,* 873 F.Supp. 1153 (N.D.Ill.1995) (Stage IV breast cancer: PSCS not specifically excluded in rider purporting to limit the use of ABMT); *Wheeler v. Dynamic Engineering, Inc.,* 850 F.Supp. 459 (E.D.Va. 1994) (Stage IV breast cancer: "experimental" defined as "investigatory or ... unproven ... or ... [not meeting] generally accepted standards of usual professional medical practice in the general medical community"); *Jenkins v. Blue Cross/ Blue Shield of Michigan,* Index # 3:93 CV 7295

cases provide little assistance since, by virtue of the task, they each are specifically focused on the particular contract language at issue. Many of the courts, similar to this one, have felt compelled to note the difficulty of the decision before the courts and perhaps the ultimate inappropriateness of the court as the arbiter of social policy in such a case specific manner as is required by the judicial process.

### I. *Empire's Conflict of Interest Requires that the Claim be Reviewed with a Reduced Level of Deference*

■ Where discretion to interpret ERISA plan terms is reserved by the plan administrator, courts are required to review those interpretations applying an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *Firestone* also instructs

courts that if the plan administrator "is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" 489 U.S. at 115, 109 S.Ct. at 957.

The parties agree that the Plan reserves the right to the administrator to interpret the Plan terms. In particular, the Experimental Exclusion section of the contract reads, in relevant part, "we will not cover any treatment .... if, *in our sole discretion,* it is not medically necessary.... We may apply the following five criteria in exercising *our discretion* and may in *our discretion* ..." apply any or all of them. (emphasis added). The language of the Rider unambiguously reserves to the Plan administrator the right to determine whether or not a treatment is exempt from coverage under this section. The standard of review is therefore whether the decision was arbitrary and capricious.

(N.D.Ohio May 9, 1994) (ABMT specifically excluded, but HDC covered) (Stage-unspecified breast cancer: "experimental and investigational" provision requires consideration of "accepted national standards of practice in the medical profession") (copy supplied at Appendix); *Kekis v. Blue Cross and Blue Shield*, 815 F.Supp. 571 (N.D.N.Y.1993) (Stage IV breast cancer: "experimental/investigative" defined as "[not] recognize[d] as accepted medical practice"); *Duckwitz v. General American Life Ins. Co.*, 812 F.Supp. 864 (N.D.Ill.1993) (Stage IV breast cancer: HDC/ABMT not excludible as an "organ transplant"); *Wilson v. Group Hospitalization and Medical Svcs., Inc.*, 791 F.Supp. 309 (D.D.C. 1992) (Stage IV breast cancer: "organ transplant" exclusion does not reach ABMS in support of HDC); *Kulakowski v. Rochester Hosp. Svc. Corp.*, 779 F.Supp. 710 (W.D.N.Y.1991) (Stage IV breast cancer: exclusion for treatments "experimental in nature" including "procedures under continued scientific testing and research with questions ... as to safety and efficacy"); *Bucci v. Blue Cross–Blue Shield of Connecticut*, 764 F.Supp. 728 (D.Conn.1991) (Stage IV breast cancer: "experimental and investigational" defined to mean "not recognized as accepted medical practice"); *Adams v. Blue Cross/Blue Shield of Maryland*, 757 F.Supp. 661 (D.Md.1991) (Stage IV breast cancer: "experimental or investigational" defined as "not generally acknowledged as accepted medical practice by the suitable medical specialty practicing in Maryland"); *Pirozzi*, 741 F.Supp. 586 (Stage IV breast cancer: "experimental and clinically investigative" defined to mean "of no scientifically proven value" or "not in accordance with generally accepted standards of medical practice"); *Taylor v. Blue Cross/Blue Shield of Michigan*, 205 Mich.App. 644, 517 N.W.2d 864 (1994) (Stage IV breast cancer: "experimental" and "research in na-

ture" defined to mean "without contemplation of any benefit"); *Tepe v. Rocky Mountain Hospital,* 893 P.2d 1323 (Colo.App.1994) (metastatic breast cancer: exclusion for "services and supplies ... which are investigative, mainly for research purposes, or experimental in nature").

Decisions denying coverage include: *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793 (10th Cir.1995) (Stage IV breast cancer: "experimental or investigational" defined as "[a]ll phases of clinical trials"); *Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d 1405 (7th Cir.1994) (Stage IV breast cancer: exclusion barring treatments "in connection with medical or other research" interpreted to encompass treatment given within a research protocol); *Nesseim v. Mail Handlers Benefit Plan,* 995 F.2d 804 (8th Cir.1993) (Stage IV breast cancer: "organ transplant" exclusion reaches ABMT in support of HDC); *Harris v. Mutual of Omaha Co.,* 992 F.2d 706 (7th Cir. 1993) (Stage IV breast cancer: "experimental or investigational" defined, *inter alia,* as any treatment which is the "subject of on-going phase I, II, or III clinical trials"); *Holder v. Prudential Ins. Co. of America,* 951 F.2d 89 (5th Cir.1992) (Stage IV breast cancer: HDC/ABMT treatment provided in 1987 deemed "experimental in nature"); *Grethe v. Trustmark Ins. Co.,* 881 F.Supp. 1160 (N.D.Ill.1995) (Stage IV breast cancer: "medically necessary" defined as "treatments ... reimbursed by Medicare" and as "treatments ... not furnished in connection with medical or other research"); *Hasty v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 851 F.Supp. 1250 (N.D.Ind.1994) (Stage II/III breast cancer: "experimental" defined to mean "not uniformly and professionally endorsed by the general medical community as standard medical care).

■ However, when a claims administrator's role as a decision-making fiduciary "lies in perpetual conflict" with its dual role as an insurer which must constantly strive to make its revenues exceed its costs, a higher level of scrutiny is required. *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1561 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). "To the extent that a fiduciary operates under a conflict of interest, that conflict should be weighed in determining whether an abuse of discretion occurred." *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 59 (2d Cir.1994). The "arbitrary and capricious" standard is a flexible one that must be tailored to the particular circumstances that may have influenced the Plan administrator in deciding whether to award benefits. *See Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1053 (7th Cir.1987).

Courts have undertaken a more stringent analysis under the "arbitrary and capricious" standard where the plan administrator was an employee of the defendant company or where the ERISA plan was operated from the company's operating revenues. *See Sullivan v. LTV Aerospace and Defense Co.*, 1993 WL 405495 (W.D.N.Y. September 30, 1993) (*citing Clark v. Bank of New York*, 801 F.Supp. 1182 (S.D.N.Y.1992)); *Zuckerbrod v. Phoenix Mutual Insurance Co.*, 882 F.Supp. 48, 49 (E.D.N.Y.1995).

■ Empire, in determining Whitney's claim, was subject to the influence of a substantial conflict. Empire is at financial risk if the cost of its claims exceeds the premiums it has collected. The ultimate decision to approve or deny coverage resides in Empire's medical director. Empire was administering claims under a policy it issued and for which it was financially responsible. This is the circumstance under which courts have held repeatedly that the insurance company is operating under an inherent conflict of interest:

> Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business. That is, when

an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs "direct, immediate expense as a result of benefit determinations favorable to [p]lan participants."

*Brown*, 898 F.2d at 1561 (citation omitted). *See also Pitman v. Blue Cross & Blue Shield of Oklahoma*, 24 F.3d 118, 123 (10th Cir. 1994); *Doe v. Group Hospitalization & Medical Svcs.*, 3 F.3d 80, 86–87 (4th Cir., 1993); *Wilson v. Group Hospitalization & Medical Svcs.*, 791 F.Supp. 309, 312 (D.D.C.1992), *app. dismissed, motion to vacate denied*, 995 F.2d 306 (1993); *Kekis v. Blue Cross & Blue Shield*, 815 F.Supp. 571, 583 (N.D.N.Y.1993); *Bucci v. Blue Cross & Blue Shield*, 764 F.Supp. 728, 730 (D.Conn.1991); *Poole v. Seattle–First Nat. Bank*, 741 F.Supp. 837, 845–846 (E.D.Wash.1990). The fact that Blue Cross Blue Shield is a not-for-profit corporation, does not alter the Courts' conclusions. *See Brown, Pitman, Doe, Wilson, Kekis,* and *Bucci* (cited directly above, all were cases with a Blue Cross & Blue Shield defendant).

Presented with Whitney's claim, Empire was faced with the conflict of interest inherent to an insurer acting as plan administrator and was particularly conflicted because of the prospect of an unusually expensive benefit in a high-incidence disease. Under these circumstances, the denial of coverage must be reviewed with a significantly reduced level of deference.

## II. *Applying the Reduced Deference Review*

Several Circuits have attempted to clarify the means by which the courts should review decisions by ERISA fiduciaries which require this reduced deference in light of a conflict of interest. *See, e.g., Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (9th Cir.1995); *Doe v. Group Hospitalization & Medical Serv.*, 3 F.3d 80, 87 (4th Cir.1993); *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1561 (11th Cir.1990), *cert. denied* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052–53 (7th

Cir.1987); *Denton v. First National Bank of Waco,* 765 F.2d 1295 (5th Cir.1985).

The Circuit Courts have described two slightly different methods for applying this arbitrary and capricious standard in light of the conflict of interest. The Second Circuit has not yet addressed this issue.

The Fourth and Seventh Circuits describe a continuum of deference that they will apply to decisions made by conflicted fiduciaries. *Doe,* 3 F.3d at 87; *Van Boxel,* 836 F.2d at 1052–53. In *Doe,* the Fourth Circuit Court of Appeals stated that "the fiduciary decision will be entitled to some deference but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe,* 3 F.3d at 87.

In *Doe,* after determining that less deference was due to the insurer, the Court went on to apply the general contract principle of construing the contract against the drafter. *Id.,* at 89. The Second Circuit has applied this principle when interpreting ERISA contract provisions reviewed under a *de novo* standard, *see Masella v. Blue Cross and Blue Shield of Connecticut,* 936 F.2d 98, 107 (2d Cir.1991), but has indicated that it is "less inclined to rely on this principle of construction where the plan grants the fiduciary discretion to interpret the plan;" where an arbitrary and capricious standard is applied. *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 61 (2d Cir.1994).

The approach adopted by the Fourth and Seventh Circuits will be called the "continuum approach."

The *Brown* Court describes the continuum of the arbitrary and capricious standard and attempts to define various positions along the continuum. It then goes on to impose a shifting of the burden on a conflicted fiduciary:

> The disinterested, impartial decisionmaker deserves the greatest deference. Where the claimant does not argue or is unable to show that the trustees had a significant conflict of interest, we reverse the denial of benefits only if the denial is completely unreasonable.... Correspondingly, when ... a trustee ... has a serious conflict of interest, the proper deference to give may be slight, even zero; the decision if wrong may be unreasonable.
>
> ... The judicial hesitation to inquire into the fiduciary's motives will leave the beneficiaries unprotected unless the existence of a substantial conflicting interest shifts the burden to the fiduciary to demonstrate that its decision is not infected with self-interest ...

*Brown,* 898 F.2d at 1564–5.

The *Brown* Court, while acknowledging the continuum concept, adopts a methodology described by the Fifth Circuit in *Denton v. First National Bank of Waco,* 765 F.2d 1295 (5th Cir1985). *Denton* and *Brown* hold that the first step in applying the reduced deference is to determine the legally correct interpretation of the disputed plan provision. In other words, has the employee proposed a sound interpretation of the plan; one that can rival the fiduciary's interpretation. Thereafter, the Court evaluates whether the fiduciary was arbitrary and capricious when it adopted a different interpretation. *Brown,* 898 F.2d at 1570 (describing the methodology recommended by the Fifth Circuit in *Denton,* 765 F.2d at 1304).

The Ninth Circuit, in *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d at 1322–23, likened its approach to that of the Eleventh Circuit in *Brown* and described it as follows:

> First, we must determine whether the affected beneficiary has provided material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. If not, we apply our traditional abuse of discretion to the review. On the other hand, if the beneficiary has made the required showing, the principles of trust law require us to act very skeptically in deferring to the discretion of the administrator who appears to have committed a breach of fiduciary duty. (citations omitted) ...
>
> ... Where the affected beneficiary has come forward with material evidence of a violation of the administrator's presumptively void decision. In that circumstance,

the Plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny the benefits. If the plan cannot carry that burden, we will review the decision de novo, without deference to the administrator's tainted exercise of discretion.

*Atwood,* 45 F.3d at 1322.

This can be termed the "two-step approach."

Under either formulation of this modified arbitrary and capricious review, the Plan's determination must be reversed. Since the two-step approach provides a clearer framework for evaluation, it shall be relied upon primarily.

A. Applying the *Two–Step* Methodology, the Determination to Decline Coverage was Arbitrary and Capricious.

■ Having already determined that Empire had a significant conflict when it decided whether Whitney's treatment was "experimental," the second step of the inquiry must be addressed. The second step asks if the employee has proposed a sound interpretation of the plan; one that can rival the fiduciary's interpretation. In this case, Whitney suggests that the appropriate interpretation is a plain reading of the Definition Section and that if one does that, primacy need be given to the definitional Standards and their requirement that a treatment be "Effective," "Appropriate," and "of Proven Benefit."

According to Whitney:

A common-sense reading of the provision, which consists of two definitional standards followed by five discretionary TEC Criteria, reveals that the definitional standards provide the structural framework through which the remainder of the provision is given shape and substance. Without the foundation of the definitional standards— which mandate that a treatment be supported by medically acceptable proof of efficacy and appropriateness—the remainder of the provision collapses into a list of inherently arbitrary criteria which by the Plan's own admission can, but need not be applied to determine whether or not a particular treatment will be covered. This super elasticity renders the "criteria" almost meaningless and allows for almost any decision made based on this to be supported by a retrospective analysis ...

Whitney argues that given the elasticity of the criteria, that the better approach is to return to the first requirements.

The criteria in this policy are so elastic as to be almost meaningless. This is particularly true when Empire reserves the right to apply "any or all" of the TEC criteria to the review of the literature. The ability to apply a roaming set of fairly non-directive standards to the field of available data renders the "criteria" suspect. This coupled with the fact that there is no objective standard by which the criteria are judged, makes the criteria highly manipulable. *See Bucci v. Blue Cross–Blue Shield of Connecticut,* 764 F.Supp. 728, 733 (D.Conn.1991) (noting that the absence of a threshold of acceptability in the exclusionary language gave the insurer an unacceptable "floating standard which can rise or fall in any fact situation," the court held that the coverage denial was "arbitrary and capricious."). The criteria here are similarly flawed. Determinative criteria including "conclusive evidence," "definitive positive effect on health outcomes," "well-designed investigation" with "measurable results" are subject to an enormous range of interpretations, as was witnessed over the course of this trial.

In the end, there was support in the record through testimony of credible physician witnesses that the HDC/ABMT treatment is effective and appropriate and of proven benefit and that each of the TEC criteria was met. One of Plaintiff's experts, Dr. Ronald H. Blum ("Dr. Blum") referred to numerous peer-reviewed articles in his testimony that demonstrate the efficacy of the treatments. While his conclusions were also supported by abstracts, this does not invalidate the conclusions. In fact, Empire itself relied on abstracts in reaching its determination that HDC/ABTM was experimental under its criteria. Furthermore, Dr. Blum noted that many abstracts are peer-reviewed, a recurring and emphasized requirement of the TEC criteria.

There was general agreement among the witnesses that the treatment was appropriate. While Empire focussed on the lack of any literature finding HDC/ABMT superior to the standard treatment, this is not the requirement of the TEC criteria. The only reference in the criteria which seeks to compare the treatment under consideration with the standard treatment, requires that "the treatment is at least as effective" as established technology. Many of the articles introduced by the experts demonstrated that HDC/ABMT was at least as effective as CDC.

Whether one relies on the definitions or the definitions in combination with the TEC criteria, Whitney has met her burden of putting forward a "sound interpretation of the plan"—one that concludes that Whitney's treatment should be covered.

The final question is then whether the decision not to cover the treatment was arbitrary and capricious or a reasonable alternative decision. The abuse of discretion is revealed by the inconsistent manner in which Empire handled the determination of HDC's status under the Experimental Exclusion. One example of such inconsistency is Empire's treatment of "published peer-reviewed medical literature." As has been previously noted, Empire has sought to negate or diminish Plaintiff's reliance on abstracts even though such abstracts are peer-reviewed. Nonetheless, Dr. Blitz admitted that his staff oncologist at Empire reads such abstracts in making determinations about coverage. In a post-trial stipulation submitted by the parties, Empire acknowledged that in approving autologous bone marrow or stem cell support for the treatment of multiple myeloma, it relied upon five articles, two of which were abstracts. Empire's varying application of its "peer-reviewed medical literature" requirement—invoking and relaxing the requirement to satisfy its own desire to discredit HDC for breast cancer—is arbitrary and capricious.

The most compelling case of the inconsistent application, and therefore arbitrary and capricious application, of the TEC criteria was evidenced by Empire's determination that HDC treatment coupled with ABMT was covered in the case of multiple myeloma. This treatment was approved for coverage even though (1) no Phase III randomized comparative trials have been completed—although Empire implied that this would be necessary in the case of breast cancer; and (2) most importantly, that the available evidence for HDC/ABTM does not provide a more definitive answer with respect to coverage than did the evidence in the case of breast cancer.

A peer-reviewed article, published more than a year after Empire began covering HDC/ABTM for multiple myeloma and which Empire used to support the coverage of multiple myeloma, concluded "[t]he next several years will clarify if and to what extent high-dose therapy approaches combined with autologous and allogeneic transplants are superior to standard-dose therapies." This language is strikingly similar to the disclaiming language in the breast cancer studies recited by Empire in justifying the denial of Whitney's coverage. Yet, despite this similarity between the quality or definitiveness of the available studies, Empire has determined that the TEC Criteria are satisfied with regard to HDC treatments for multiple myeloma, but not for breast cancer.

■ Subjecting breast cancer to a rigorous interpretation of the TEC Criteria, Empire arbitrarily diverged from the less-demanding construction of these criteria which it has applied, in the case of multiple myeloma. Such inconsistency is evidence of arbitrary and capricious decision-making. *Sansevera v. E.I. DuPont de Nemours & Co., Inc.,* 859 F.Supp. 106 (S.D.N.Y.1994) (inconsistent application of requirement by fiduciary that applicant for disability benefits demonstrate "with medical certainty that his disability will be lifelong" constitutes basis for finding fiduciary's actions arbitrary and capricious).

Empire has disputed the conclusion that multiple myeloma was at a similar stage in terms of its experimental nature when it was approved by them for coverage, but no evidence has been presented to that effect. Thus, the decision to fund the treatment for one disease and not for the other is arbitrary. While the financial implications might explain

the difference in the outcome, there is no mention in the TEC criteria that overall financial implications of the coverage for the Plan will be considered.

Applying the continuum approach adopted by the Fourth and Seventh Circuits, the same conclusion is reached. Operating under a significant conflict, the insurer is due little deference. In such a case, Whitney prevails because 1) she is correct that the treatment meets the articulated criteria; and 2) because given the reduced deference and the arbitrary application of the criteria across diseases, the decision by Empire cannot stand. Assuming for the sake of argument that the interpretations of the data were equally credible, which they are not, construing the contract against the drafter, Whitney would prevail. *See Masella v. Blue Cross and Blue Shield of Connecticut,* 936 F.2d 98, 107 (2d Cir.1991).

### III. *Defendant will be Provided with Additional Time to Brief the Issues of Attorney's Fees*

Whitney seeks an award of attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g), which provides:

> In any action under this chapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

*Id.* The Court of Appeals has held that in exercising its discretion to grant such an award, a court should consider five factors:

> (1) the degree of the offending party's culpability or bad faith;
>
> (2) the ability of the offending party to satisfy an award of attorney's fees;
>
> (3) whether an award of attorney's fees would deter other persons from acting similarly under like circumstances;
>
> (4) the relative merits of the parties' positions; and
>
> (5) whether the action conferred a common benefit on a group of ... plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir., 1987), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990). *See also Sansevera,* 859 F.Supp. at 116–117.

In its submission to the Court, Empire requested permission, should the Court reach the point of determining the appropriateness of attorneys' fees, to brief the issue at a later time. The time has arrived. The parties shall agree to a briefing schedule on the attorneys' fees issue with the motion returnable on April 10, 1996 or at such other time as the parties shall agree upon.

### CONCLUSION

For the reasons that are described above, judgment shall be entered for Whitney subject to the determination of attorneys' fees and costs.

It is so ordered.