Karen **GLAUSER–NAGY**, Plaintiff,

v.

**MEDICAL MUTUAL OF OHIO**, Defendant.

No. 3:97CV7714.

United States District Court, N.D. Ohio, Western Division.

Dec. 8, 1997.

Robert A. Koenig, Jenifer A. Belt, Shumaker, Loop & Kendrick, Toledo, OH, for Karen Glauser Nagy.

R. Benton Gray, Lisa Riso Battaglia, Thompson, Hine & Flory, Cleveland, OH, for Medical Mutual of Ohio.

## MEMORANDUM AND ORDER

JOHN W. POTTER, District Judge.

This matter is before the Court on plaintiff's motion for a preliminary injunction, and defendant's opposition. The Court heard oral argument and received evidence on November 19–20, 1997. The parties have filed post-hearing briefs. For the following reasons, plaintiff's motion will be denied.

This is a dispute over plaintiff's entitlement to health insurance benefits which her insurance provider claims are "experimental/investigational," and therefore not provided under her plan.

Plaintiff Karen M. Glauser–Nagy is employed by Seaway Food Town, Inc. and receives health benefits under an employer-provided self-funded plan (the Plan), which is administered by defendant Medical Mutual of Ohio (Medical Mutual). Medical Mutual also provides stop-loss coverage for the Plan.

Prior to January, 1997, Seaway Food Town's employee health benefits plan was administered by Medical Mutual's predecessor-in-interest, Blue Cross/Blue Shield of Ohio. The Summary Plan Description (SPD) expressly excluded coverage for services that were either "Experimental/Investigative" or "not Medically Necessary, as determined by the Plan." (Blue Cross/Blue Shield SPD, at 23.) The Plan defined "Experimental/Investigative" as:

[A]ny treatment, procedure, facility, equipment, drug, device or supply which we do not recognize as accepted medical practice or which did not have required governmental approval when you received it. Determination will be made by the Plan in its sole discretion and will be conclusive.

*Id.* at 37. The Plan defined "Medically Necessary" as:

[A] service or supply that is required to diagnose or treat an injury, ailment, condition, disease, disorder or illness and which the Plan determines is:

● appropriate with regard to the standards of good medical practice.

● not primarily for the convenience of you or a Provider.

● the most appropriate supply or level of service which can be safely provided to you. . . .

*Id.* at 38.

At some time in early 1997, Blue Cross/Blue Shield of Ohio changed its name to Medical Mutual of Ohio. In June, 1997, employees were supplied with new Summary Plan Descriptions, which claimed to be retroactive to January 1, 1997. The parties have testified that the Plan coverage did not change. However, the new SPD redefined "Experimental or Investigational Drug, Device, Medical Treatment or Procedure" as:

[A] drug, device, medical treatment or procedure is Experimental or Investigational:

● if the drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;

● if reliable evidence shows that the drug, device medical treatment or procedure is the subject of on-going phase I, II, or III clinical trials or is under study to determine maximum tolerated dose, tox-

icity, safety, efficacy, or efficacy as compared with the standard means of treatment or diagnosis; or

- if reliable evidence shows that the consensus of opinion among experts regarding the drug, device, medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, toxicity, safety, efficacy, or efficacy as compared with the standard means of treatment or diagnosis.

(Medical Mutual SPD, at 32.)

In January, 1997, a 5.8–centimeter mass, which was subsequently diagnosed to be Stage III breast cancer,[1] was discovered in plaintiff's right breast. The tumor was removed on February 27, 1997. On March 7, 1997, a 4–centimeter lymph node was removed from under plaintiff's right arm; that node was also diagnosed to be cancerous. Tests performed subsequent to the two surgeries indicated that no cancer was present in plaintiff's body. However, the likelihood that a breast cancer patient with a tumor as large as plaintiff's will develop metastatic cancer subsequent to surgical resection is 50–70% if she is not treated after surgery. A patient who is treated with standard dose chemotherapy faces a 40–50% chance of developing metastatic cancer.

Plaintiff's treating physicians, in consultation with plaintiff, recommended a three-step treatment plan for plaintiff. First, plaintiff would undergo four rounds of standard dose chemotherapy. Second, plaintiff would undergo a procedure known as high dose chemotherapy with peripheral stem cell rescue. Third, plaintiff would undergo a mastectomy and chest wall radiation.

1. Breast cancer is classified into stages for purposes of prognosis and treatment. Stage I cancer is characterized by small tumors within the breast, with no lymph node involvement. Stage II breast cancer involves larger tumors from 2–5 cm. in diameter and/or with lymph node involvement. In Stage III, the tumor measures more than 5 cm. and may involve a great number of lymph nodes. In Stage IV, the cancer has spread or metastasized to other organs of the body.

2. The Technical Evaluation Committee (TEC) guidelines authorize approval of a medical procedure only if the following five criteria are met:

The second phase of the recommended procedure, high dose chemotherapy with peripheral stem cell rescue (HDC–PSCR) is the procedure that is at issue in this case. The phrase "high dose chemotherapy" (HDC) refers to chemotherapy at doses that are so toxic to the patient's bone marrow that the patient could not survive without infusions from stem cells either from the bone marrow or peripheral blood. HDC–PSCR involves harvesting healthy blood cells from the patient prior to high does chemotherapy, freezing the cells during the chemotherapy, and then reinfusing the cells back into the patient's body once the drugs have been administered. The procedure has been widely available for over ten years and is an accepted treatment for metastatic breast cancer as well as many other forms of cancer.

When plaintiff requested pre-approval from Medical Mutual for payment for the HDC–PSCR treatment, that request was sent to an independent physician consultant for a predetermination, in accordance with Medical Mutual's standard procedures. Medical Mutual asks its consulting physicians to use a set of guidelines developed by the Blue Cross/Blue Shield Association in conjunction with Kaiser Permanente in evaluating medical necessity.[2] Those guidelines generally state that HDC–PSCR may be approved as medically necessary for patients with metastatic (Stage IV) breast cancer, but is still experimental/investigatory as to patients with Stage II or III breast cancer. Thus, the guidelines do not authorize payment for HDC–PSCR for patients with Stage III breast cancer, as plaintiff has. In pertinent part, the guidelines provide as follows:

1. The technology must have final approval from the appropriate government regulatory bodies.

2. The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes.

3. The technology must improve the net health outcome.

4. The technology must be as beneficial as any established alternatives.

5. The improvement must be attainable outside the research setting.

Thirty-three studies that include approximately 850 patients have reported outcomes of HDC/AuSCS[3] for breast cancer. Unfortunately, none of the studies was controlled, and the patients in the studies varied widely with respect to many factors that can affect outcomes irrespective of the treatment. Furthermore, the results achieved with conventional doses overlapped the survival results achieved with HDC/AuSCS. Given the wide variations in patient characteristics and the wide and overlapping ranges in outcomes in both the patients who received HDC/AuSCS and those who received conventional doses, it is not possible to draw conclusions about the effect of HDC/AuSCS on health outcomes.

\* \* \* \* \* \*

In order to draw a conclusion that HDC/AuSCS improves survival compared with conventional doses, the series that used HDC/AuSCS would have to uniformly show a much better survival than that shown in the series of conventional doses. Any overlap in the results of any of the clinical series of HDC/AuSCS versus conventional doses would indicate the strong possibility that any apparent differences in outcomes could be due to differences in patient characteristics and other nontreatment factors, rather than to the use of high-dose chemotherapy.

\* \* \* \* \* \*

Although none of the studies of HDC/AuSCS was controlled, the authors of one of the clinical series did try to identify a comparison group. To provide a comparison group for the 85 patients in their study, Peters and colleagues selected 245 women who had stage II disease, 10 or more positive nodes, age less than 57 years, and no relapse within 4 months from 3414 patients treated with conventional doses in 3 CALGB trials conducted over the last 17 years. Considering women from all 3 trials, there appears to be a benefit to HDC/AuSCS. However, the authors stress the need for caution due to numerous differences in the patients:

"Comparison to historical populations is subject to many potential biases. Differences in patient selection, staging evaluation, age, hormone-receptor status, dose intensity, follow-up duration, and unknown factors may complicate comparisons." Another potential bias that affects comparisons to historical controls is that, because of changes in medical practices, historical data tend to underestimate the effectiveness of contemporary conventional-dose regimens.

\* \* \* \* \* \*

The available evidence does not support a conclusion that compared with the currently available alternative, HDC/AuSCS provides a survival benefit for women who have stage II or noninflammatory stage III disease and 10 or more positive axillary nodes.

\* \* \* \* \* \*

[For patients with inflammatory stage III disease] HDC does not provide any clear advantage in 3–year survival—the probability distributions for the HDC/AuSCS studies are broadly overlapped by studies that used conventional doses. Unfortunately, studies of HDC/AuSCS report a much higher frequency of treatment-related fatalities compared to conventional-dose treatment (11% vs. 1%, respectively).[4] ... The available evidence does not support a conclusion that, compared with the currently available alternatives, HDC/AuSCS improves survival in this group of patients.

Plaintiff's predetermination request was evaluated by oncologist John K. Erban. Dr. Erban reported, in pertinent part, as follows:

High dose chemotherapy is appropriate in the investigational setting for stage IIIa or b breast cancer. Randomized trials are in progress assessing the worth of high dose chemotherapy in the adjuvant[5] setting for women with breast cancer. The magnitude of benefit overall cannot be as-

---

3. High Dose Chemotherapy with Autologous Stem Cell Support.

4. The testimony at the preliminary injunction hearing was that treatment-related mortality

rates have been lowered to 5% (HDC/AuSCS) and .5% (conventional) since the time this guideline was written.

5. *I.e.,* post-surgical.

sessed for patients with IIIb breast cancer outside of a clinical trial, in my opinion.

\* \* \* \* \* \*

There are no studies to date which demonstrate in a phase III [6] randomized setting that dose intensification to transplant doses will result in a superior long term DFS,[7] or OS,[8] and certainly the costs in terms of long term morbidity are unknown as well. It is established that the overall mortality from the therapy is higher than with standard treatment, although less than what was reported by Peters in his initial study.

\* \* \* \* \* \*

The relatively small phase II studies published to date including the J. Medicine article noted below do not make it possible to conclude that the use of high dose therapy for all patients with extensive stage II/III breast cancer is of benefit, or the best standard therapy. Therefore, it remains of critical importance in my view to perform this therapy whenever possible in the setting of well designed investigations.

\* \* \* \* \* \*

Peters et al. reported a 71% event free survival and a 78% overall survival at five years with a 12% mortality related to therapy.

\* \* \* \* \* \*

Finally, there are two randomized controlled trials in progress comparing transplant to best standard therapy for stage II/III patients with ten or more positive nodes, in progress since 1990. One has met original accrual and has had accrual extended. Neither has been stopped by statisticians prematurely because of significant differences in either treatment arm.

\* \* \* \* \* \*

[In this patient] the likelihood of relapse is likely to be at least one third and perhaps higher. There are no prospective data to suggest that ABMT.[9] will alter this as yet, but there is consensus that in the setting of well designed investigations, this therapy is appropriate. I would disagree with the statement that this type of therapy is known to offer the best chance of cure, but I would strongly support the inclusion of these patients in trials involving high dose therapy.

Outside of a clinical trial, it remains impossible to determine how much benefit transplantation affords above chemotherapy, radiation therapy, and hormonal therapy in patients with clinical stage II/III breast cancer.... It is not possible to conclude, in my view, that transplantation outside of a clinical investigation offers additional benefits to the patient in this clinical circumstance, above that afforded by other measures noted above, although it might.

Based on Dr. Erban's report, Medical Mutual denied plaintiff's request for coverage on the ground that HDC–PSCR was "experimental/investigational" for patients in her clinical category.

Plaintiff appealed that denial of coverage. Along with the appeal, plaintiff's physicians sent letters in which they opined that the procedure was not "experimental/investigational" for a patient with plaintiff's condition, and included with their letters copies of two medical journal articles: William J. Gradishar et al., *High–Dose Chemotherapy for Breast Cancer*, 125 ANN. INTERNAL MED. 599 (1996), and W.R. Bezwoda et al., *High–Dose Chemotherapy with Hematopoietic Rescue as Primary Treatment for Metastatic Breast*

---

**6.** Clinical trials are usually classified into one of three phases. Phase I involves initial testing for the feasibility of conducting an experiment, the aims being to determine the appropriate dosage of drugs administered within a treatment, and to evaluate the toxic effects produced by the drugs. In Phase II relatively small studies, usually nonrandomized, are conducted to determine whether the treatment has any observable effect in the patients receiving it. Phase III, the randomized clinical trial, is the last stage of research, and involves using a control group of subjects who receive conventional, nonexperimental treatment; the responses of the two groups are documented, analyzed and compared to assess the efficacy of the experimental treatment as compared with conventional treatments.

**7.** *I.e.,* disease-free survival.

**8.** *I.e.,* overall survival.

**9.** *I.e.,* Autologous Bone Marrow Transplant. ABMT is the alternative to peripheral stem cell rescue as a support procedure after HDC. For purposes of this analysis, the two procedures are interchangeable.

*Cancer: A Randomized Trial,* 13 J. CLINI- CAL ONCOLOGY 2483 (1995). Both articles conclude that HDC shows promise as a treat- ment for breast cancer, but has not yet been shown to offer results superior to those ob- tained by standard-dose chemotherapy. The Bezwoda article addressed only the efficacy of HDC to treat *metastatic* breast cancer, which is not at issue in this case. The Grad- ishar article addressed stage II and III breast cancer, and stated, in pertinent part, that:

> High-dose chemotherapy followed by transplantation of autologous bone marrow or peripheral blood stem cells ... has emerged as a common strategy for treat- ing breast cancer. However, few data suggest that this approach is superior to standard-dose chemotherapy in either the adjuvant or metastatic setting.... [M]ost presentations at recent oncology meetings have shown the "feasibility" of high-dose chemotherapy, but little information has been provided on long-term benefit. Un- less the use of high-dose chemotherapy in patients with breast cancer significantly improves disease-free survival, and, more important, overall survival compared with standard-dose chemotherapy, the associat- ed morbidity, mortality, and cost of this approach will be unacceptable.
>
> * * * * * *
>
> [H]igh-dose chemotherapy is being stud- ied as adjuvant therapy for patients with high-risk stage II or stage III breast can- cer. Because these patients have subclini- cal disease and have not previously re- ceived therapy, administering high-dose chemotherapy as adjuvant therapy is theo- retically sound. The critical question that remains unanswered is whether high-dose chemotherapy offers any advantage over several cycles of standard-dose chemother- apy or dose-intensive chemotherapy that does not cause ablation of bone marrow.
>
> * * * * * *
>
> The preliminary results of nonrandom- ized phase II studies have generated opti- mism about high-dose chemotherapy. Pe- ters and colleagues recently provided an update on the largest experience with high-dose chemotherapy to date.... [Their nonrandomized study of 85 patients] suggests that adjuvant high-dose chemo-

> therapy may be superior to standard-dose chemotherapy for patients with high-risk primary breast cancer....
>
> Critics have countered that the superior results are primarily due to the strict se- lection criteria used in the adjuvant high- dose chemotherapy trials; these criteria were not used in older trials of adjuvant chemotherapy.... [Up to 23%] of the his- torical controls in the trial by Peters and colleagues may have been found to have metastatic disease if they had been sub- jected to the same rigorous criteria. In addition, irradiation of the chest wall was required in the high-dose chemotherapy trial after disease on the chest wall re- curred in several of the first patients treat- ed. The routine administration of tamoxi- fen may have further reduced the risk for recurrence in patients receiving high-dose chemotherapy.
>
> * * * * * *
>
> NCI-sponsored high-priority trials ... are designed to determine whether high- dose chemotherapy offers a long-term ben- efit compared with standard-dose adjuvant chemotherapy. Although few data support this conclusion, the perception of benefit based on results of phase II, single-institu- tion trials has created an obstacle to the completion of these important trials.
>
> * * * * * *
>
> The long-term benefit of adjuvant, high- dose chemotherapy compared with that of standard adjuvant therapy in patients with breast cancer has not been established....
>
> Some have argued that physicians have an obligation to "play their best hunch" on the basis of available data from phase II trials. As discussed earlier, however, phase II trials are small by definition and are usually single-institution studies that are highly susceptible to selection bias. The field of oncology is replete with exam- ples of phase II trials with positive results that have not been confirmed in large, multi-institution, randomized phase III tri- als....
>
> Such examples ... should remind clini- cians and patients that intuition does not constitute scientific proof. As Freedman

has argued, clinical trials are necessary when "honest, professional disagreements among expert clinicians [exist] about the preferred treatment. At this point, a state of 'clinical equipoise' exists."

Plaintiff's first-level appeal was evaluated by oncologist Francine Foss. Dr. Foss reported, in pertinent part, as follows:

Without the data from the randomized studies which are underway, it is impossible to conclude with certainty that high dose therapy is superior to standard chemotherapy with or without chest wall irradiation in the adjuvant setting, and the follow-up data from these studies will not be mature for several more years.... Despite the limited available data demonstrating improved disease-free survival after high dose therapy in Stage III breast cancer, it would not be unreasonable or medically inappropriate, however, to consider this approach if the patient is treated on an investigational protocol as is proposed here.

Based on Dr. Foss's report, Medical Mutual denied plaintiff's first-level appeal on the ground that HDC–PSCR was "experimental/investigational" for patients in plaintiff's clinical category.

Plaintiff brought a second-level appeal of that denial. Along with the appeal, plaintiff's treating physician, Dr. Overmoyer, sent a letter in which she opined that the procedure was not "experimental/investigational" for a patient with Plaintiff's condition.

Plaintiff's second-level appeal was evaluated by oncologist Gary Gilbert. Dr. Gilbert reported, in pertinent part, as follows:

High dose therapy is not medical necessity because it remains investigational for this indication.

\* \* \* \* \* \*

The editors of the best respected medical journals and the authors that publish articles on the treatment of breast cancer in those journals believe that high dose chemotherapy followed by autologous bone marrow reconstitution should not yet be standard treatment for patients at high risk for recurrence of breast cancer. The directors of many transplant programs and a significant fraction of practicing oncologists believe otherwise.... There are no published results from prospective, randomized trials comparing high dose therapy vs. standard therapy for patients at high risk of recurrence.... A high priority, NIH-sponsored multi-institution prospective, randomized trial is currently underway to address this issue.

Based on Dr. Gilbert's report, Medical Mutual denied plaintiff's second-level appeal on the ground that HDC–PSCR was "experimental/investigational" for patients in Plaintiff's clinical category, and concluded plaintiff's appeal process.

Plaintiff then brought the instant action in this Court. She alleges that Medical Mutual's denial of her coverage request was arbitrary and capricious, and constitutes a breach of the terms of the health benefits Plan, a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,* and a breach of Medical Mutual's fiduciary duty to her under the Plan. She seeks a declaration that she is entitled to coverage for the HDC–PSCR procedure, an injunction requiring Medical Mutual to pay for the procedure, and costs and attorney's fees.

Plaintiff's motion for a preliminary injunction is now before the Court. Defendant has filed a motion for summary judgment, but that motion is not yet decisional, and the Court will not address it at this juncture.

█ The granting or denial of a preliminary injunction is within the sound discretion of the trial court. *Virginian Ry. Co. v. System Fed'n, R.E.D.,* 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). The Sixth Circuit has set forth four standards for the district court to use in making this determination: (1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) whether the plaintiffs have shown that irreparable injury will result if the preliminary injunction is not granted; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether issuing a preliminary injunction would serve the public interest. *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 564 (6th Cir.1982).

Where a preliminary injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—or where the issuance of the injunction would provide the movant with substantially all the relief she seeks and where the relief could not thereafter be undone, even if the non-moving party later prevails at trial, the requested relief should be denied unless the facts and law clearly favor the moving party. *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34–35 (2d Cir.1995); *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir.1994).

The first issue the Court must address is whether plaintiff has shown that she is substantially likely to prevail on the merits of her claim. Specifically, the Court must determine whether plaintiff is substantially likely to show that defendant's determination that HDC–PSCR is "experimental/investigational" for patients with Stage III breast cancer was arbitrary and capricious.

An initial preliminary matter the Court must address is the amount of deference to be accorded the plan administrator's determination. When an employee challenges a denial of benefits to which she claims entitlement under the terms of an employee benefit plan, the Court reviews the denial of benefits under a *de novo* standard unless the benefits plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Where the plan does give the administrator discretion to construe the terms of the plan, the Court will not disturb the administrator's interpretation if it is reasonable. *Id.* at 111, 109 S.Ct. at 954. The parties to this case agree that the Plan expressly gives Defendant discretion to determine whether a given medical procedure is "experimental/investigational." Therefore, the Court reviews the denial of benefits under an arbitrary and capricious standard.

The Sixth Circuit has stated that the Court's review is highly deferential in such cases. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997). In conducting this review, the Court considers only the facts known to the plan administrator at the time he made his decision. *Id.*

Plaintiff has argued that the Court should apply a more stringent standard of review in this case, because defendant was operating under a conflict of interest at the time the coverage determination was made. The parties do not dispute that the cost of the procedure requested by plaintiff is high enough that the stop-loss coverage provided by Medical Mutual would likely be triggered if the requested coverage were provided. However, a plaintiff seeking to avoid an "arbitrary and capricious" standard of review of a plan administrator's determination must show "not only that a potential conflict of interest exists, but that the conflict affected the reasonableness of the [administrator's] decision." *Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 477 (2d Cir. 1997). Plaintiff has made no such showing. There is no evidence that defendant applied any pressure to its independent consultants to effectuate a denial of coverage, or that the physicians who reviewed plaintiff's claim were motivated by a desire to enhance their personal or corporate financial position at plaintiff's expense. Of course, the existence of a possible conflict of interest is one factor the Court considers in determining whether the administrator abused its discretion, but, in the absence of evidence that the decision was actually tainted by the conflict of interest, the Court must use an "arbitrary and capricious" standard of review.

A second preliminary matter the Court must address is whether plaintiff's coverage request should be evaluated in accordance with the terms of the Blue Cross Summary Plan Description that was in effect prior to January 1, 1997, or the terms of the Medical Mutual Summary Plan Description that purported to take effect on January 1, 1997 but was not given to employees until June, 1997. Plaintiff made her initial precertification request on July 9, 1997.

Plaintiff argues that the terms of the Blue Cross SPD control, because she did not re-

ceive the Medical Mutual SPD until June, 1997, and she had decided to undergo HDC–PSCR as early as March or April of that year.[10] Defendant argues that the terms of the Medical Mutual SPD control, because the document itself makes the change retroactive to January 1, 1997.

It is clear under applicable Sixth Circuit precedent that Plaintiff cannot be bound by the terms of an insurance contract or SPD to which she did not have access. *See Helwig v. Kelsey–Hayes Co.,* 93 F.3d 243, 247–49 (6th Cir.1996); *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir. 1988). Therefore, the terms of the Blue Cross SPD controlled the parties' relationship until such time as plaintiff received the Medical Mutual SPD in June, 1997. After plaintiff received the Medical Mutual SPD, the terms of that document controlled. With regard to plaintiff's treatment history, the Blue Cross SPD controlled the parties' relationship at the time Plaintiff began her initial standard-dose chemotherapy; and the Medical Mutual SPD controlled at the time plaintiff submitted her precertification request for HDC–PSCR to defendant.

Therefore, the question of which document—the Blue Cross SPD or the Medical Mutual SPD—controls the outcome in this case turns on whether plaintiff's initiation of standard-dose chemotherapy during the period in which the Blue Cross SPD controlled operated to "vest" her entitlement to health benefits under the terms of that SPD, so that her employer could not amend the terms of the plan in a way that interfered with her right to those benefits.

■ ERISA welfare benefit plans, including health care plans, are exempt from the statutory vesting requirements that ERISA imposes on pension benefit plans. Accordingly, an employer may amend the terms of a health benefit plan or terminate it entirely, so long as the employee's right to the benefit has not yet vested. *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.1990). The employee challenging the modification of the health benefits plan has the burden of demonstrating that the parties intended for the benefits to vest, and such

intent may be demonstrated by "agreement or by private design." *In re White Farm Equipment Co.,* 788 F.2d 1186, 1193 (6th Cir.1986).

Plaintiff argues that coverage for all medical costs associated with the HDC–PSCR treatment vested when she began standard-dose chemotherapy, because that procedure is the first step in the multiple-phase HDC–PSCR treatment, and coverage for the entire medical procedure vests when the procedure begins. There is some disagreement in the Circuits about whether an employer can modify or reduce coverage for a particular illness or medical treatment after the employee has contracted the illness or after the treatment has already begun.

The Fifth and Eleventh Circuits have declined to read a "latent vesting requirement that ripens upon the contraction of, and the submission of claims for, a particular sickness" into ERISA, and, accordingly, have held that an employer can reduce or eliminate coverage for a particular illness even after the employee has contracted the illness and begun making claims for it. *Owens v. Storehouse, Inc.,* 984 F.2d 394, 398 (11th Cir.1993); *McGann v. H & H Music Co.,* 946 F.2d 401, 405, 407–08 (5th Cir.1991). They have held that ERISA "does not prohibit an employer from crafting its medical plan to meet economic imperatives. Neither does it mandate fixed coverage of catastrophic diseases.... ERISA provides no right to perpetual health insurance with immutable terms." *Owens,* 984 F.2d at 400.

The Fourth Circuit, on the other hand, has held that when an insurance policy terminates while an insured is in the first stage of a medical procedure covered under the terminated policy, coverage for the entire procedure vests when the procedure begins, and the employer cannot thereafter deny coverage for the entire procedure. *Wheeler v. Dynamic Eng'g, Inc.,* 62 F.3d 634, 639 (4th Cir.1995); *see also Butler v. Provident Life & Accident Ins. Co.,* 617 F.Supp. 724 (S.D.Miss.1985); *Atchley v. Travelers Ins. Co.,* 489 S.W.2d 836 (Tenn.1972). That Court held that "[w]hen an insured arranges for

---

**10.** It is worth noting, however, that plaintiff appended the Medical Mutual SPD to her complaint and did not argue that a different document controlled until oral argument.

and begins a particular medical procedure, she has for all practical purposes committed herself to undergo all required steps in that procedure. Accordingly, she has 'incurred' all expenses stemming from it." *Id.* at 639.

■ The Sixth Circuit, while it has not addressed the issue as directly as the Fourth, Fifth, and Eleventh Circuits, had occasion to deal with a closely analogous issue in *Pope v. Central States Southeast and Southwest Areas Health and Welfare Fund*, 27 F.3d 211 (6th Cir.1994). The plaintiff in Pope was diagnosed with end-stage liver disease on March 7, 1987, and received a liver transplant shortly thereafter. On January 1, 1989, the plaintiff's employer enacted a $50,-000 life-time coverage limit on benefits for liver transplants. The plaintiff received a second liver transplant on January 18, 1989, and a third liver transplant on June 20, 1989. The insurer denied benefits for the second and third transplants. The Sixth Circuit held that the employer had the right to amend its plan, even though the plaintiff had already contracted the illness at issue and had begun making claims for it. They stated that:

> Congress chose not to impose vesting requirements on welfare benefit plans for fear that placing such a burden on employers would inhibit the establishment of such plans.... [W]e would, in effect, accord employees a vested right to health and welfare benefits if, based on ERISA's fiduciary requirements, we were to adopt a rule restricting the amendment of ... welfare benefit plans.

*Id.* at 213 (internal quotes and citations omitted). Based on this language, the Court finds that the Sixth Circuit would likely join the Fifth and Eleventh Circuits to hold that ERISA permits an employer to modify coverage for a particular illness or medical treatment even after the employee has contracted the illness or the treatment has already begun. Therefore, Plaintiff's request for precertification was governed by the SPD in effect at the time she submitted her precertification request, the Medical Mutual SPD.

■ Having determined that the Medical Mutual SPD is the governing contract document, the Court addresses the ultimate merits issue in this case: whether defendant's

determination that the treatment sought by Plaintiff is "experimental/investigational" under the terms of the contract document was arbitrary and capricious. The Medical Mutual SPD defines "experimental/investigational" to include any treatment or procedure that "is the subject of on-going phase I, II, or III clinical trials or is under study to determine maximum tolerated dose, toxicity, safety, efficacy, or efficacy as compared with the standard means of treatment or diagnosis and any treatment or procedure for which the consensus of opinion among experts regarding the ... treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, toxicity, safety, efficacy, or efficacy as compared with the standard means of treatment or diagnosis."

On the undisputed facts before the Court, HDC–PSCR meets both of the above criteria for "experimental/investigational" as applied to individuals with nonmetastatic breast cancer. The witnesses for both sides agreed, and all of the journal articles submitted by both sides, indicate that HDC–PSCR is presently the subject of ongoing phase III clinical trials to determine its efficacy and safety as compared with standard-dose chemotherapy for patients with Stage II and III breast cancer. Every expert witness, every oncologist to review plaintiff's file, and every journal article submitted by either side concluded that while HDC–PSCR shows promise as a treatment for adjuvant Stage II and III breast cancer, completed phase III studies are needed before it will be possible to conclude with certainty that high dose chemotherapy is superior to standard chemotherapy for patients in plaintiff's clinical category.

Under the plain language of the Medical Mutual SPD, the coverage plaintiff seeks is excluded as "experimental/investigational." Even if this Court were to conduct a *de novo* review of defendant's determination, plaintiff has not shown entitlement to coverage. She certainly has not shown that defendant's denial of benefits was arbitrary and capricious. Despite the clear Plan language excluding coverage for the treatment she seeks, however, plaintiff has alleged several irregularities in the claims review process which, she

claims, demonstrate that defendant's denial of benefits was arbitrary and capricious.

■ First, plaintiff argues that the denial of benefits was arbitrary and capricious because the doctors who were responsible for reviewing plaintiff's precertification request had not read the Plan documents and did not know the definition of "experimental/investigational" used in the Plan. Plaintiff's first argument lacks merit. It is evident both from the testimony of Medical Mutual's Chief Medical Officer Robert E. Rzewnicki, M.D. and the reports of the three evaluating oncologists that all four of those physicians based their decisions on a definition of "experimental/investigational" identical to the definition used in the Plan, even if they were not aware of the precise Plan language defining those terms.

Second, plaintiff argues that the denial of benefits was arbitrary and capricious because Dr. Rzewnicki made the coverage determinations at every level of review, in violation of Medical Mutual's policy requiring review by different physicians at all three levels. Plaintiff's second argument is factually incorrect. Plaintiff's precertification request was initially reviewed by Dr. Erban; her first-level appeal was reviewed by Dr. Foss; and her second-level appeal was reviewed by Dr. Gilbert. Medical Mutual did not violate its policy of having its reviews conducted by three different Board Certified Physician Advisors within the appropriate medical specialty.

■ Third, plaintiff argues that the denial of benefits was arbitrary and capricious because Medical Mutual's entire decisionmaking process is fundamentally flawed. She argues that the Plan's definitions of "experimental/investigational" and "medical necessity" are internally inconsistent, that the decisionmaking process is subjected to impermissible subjectivity, and that the decisionmaking process is impermissible tainted by the use of the TEC guidelines.

The Court disagrees. The Court has reviewed the Plan documents and finds that the phrases "experimental/investigational" and "medical necessity" are defined with sufficient precision that an ordinary person can understand them. Moreover, the definitions are not patently unreasonable; they comport with ordinary custom in the medical community, as indicated by the fact that four independent physicians who had never seen the Plan language intuitively used the same definitions in making their recommendations.

Plaintiff's other arguments about the decisionmaking process are inconsistent with each other and seem to be an attempt to have it both ways: at one point, she argues that the decisionmaking process is rendered impermissible subjective because the independent reviewers are not given enough guidance; at another, she argues that the decisionmaking process is rendered impermissibly mechanistic because the independent reviewers are given too much guidance. The Court disagrees with both contentions. The TEC guidelines are a facially reasonable attempt to cabin the independent reviewers' subjectivity by providing information about the efficacy of a number of treatments for various medical conditions. At the same time, Dr. Rzewnicki's unrebutted testimony was that the independent reviewers are not restricted to the TEC guidelines in making their recommendations; therefore, the process is not impermissibly mechanistic. While it is certainly possible that Medical Mutual's procedure could lead to arbitrary and capricious results in a given case, this Court is unwilling on the record before it to strike down the entire claims precertification process as facially invalid.

■ Finally, plaintiff argues that the denial of benefits was arbitrary and capricious because Medical Mutual impermissible classified plaintiff into a subcategory of "Stage III breast cancer" patients, rather than treating her simply as a "breast cancer" patient, and giving her the coverage to which it admits she would be entitled if she were a Stage IV breast cancer patient. Again, the Court disagrees. The distinction defendant makes between metastatic and nonmetastatic cancer can be supported by a reasoned explanation, based on the differences in clinical picture for metastatic vs. nonmetastatic cancer, the differences in prognosis for the two conditions and the differences in the state of clinical studies of HDC–PSCR as a treatment for the conditions. Furthermore, contrary to plaintiff's representation, most of the recent re-

ported cases to have addressed HDC–PSCR as a treatment for breast cancer do distinguish between metastatic and nonmetastatic cancer and are more likely to grant relief where the cancer is metastatic. *See, e.g., Graham v. Medical Mut. of Ohio,* 130 F.3d 293 (7th Cir.1997) (benefits denied for patient with Stage II breast cancer, although benefits would have been granted for Stage IV patient); *Healthcare Am. Plans, Inc. v. Bossemeyer,* 953 F.Supp. 1176 (D.Kan.1996) (benefits denied for patient with Stage II breast cancer); *Whitehead v. Federal Express Corp.,* 878 F.Supp. 1066 (W.D.Tenn. 1994) (same); *cf. Bailey v. Blue Cross & Blue Shield of Va.,* 67 F.3d 53 (4th Cir.1995) (benefits granted for patient with Stage IV breast cancer); *Mattive v. Healthsource of Savannah, Inc.,* 893 F.Supp. 1559 (S.D.Ga. 1995) (same); *Frendreis v. Blue Cross Blue Shield of Mich.,* 873 F.Supp. 1153 (N.D.Ill. 1995) (same).[11]

 Since the insurance contract does not provide coverage for any medical treatment or procedure that is the subject of ongoing phase III clinical trials or any treatment or procedure for which the consensus of opinion among experts is that further studies or clinical trials are necessary to determine the efficacy of the treatment or procedure as compared with the standard means of treatment and HDC–PSCR is undisputedly both the subject of on-going phase III clinical trials and a treatment for which the consensus of opinion among experts is that further studies or clinical trials are necessary to determine its efficacy as contrasted with standard-dose chemotherapy for Stage II and III breast cancer patients, the insurance contract does not provide coverage for HDC–PSCR for patients in plaintiff's clinical category. Therefore, plaintiff is not substantially likely to prevail on her claim that defendant's denial of benefits was arbitrary and capricious.

Although it is not necessary to the Court's determination that plaintiff is unlikely to prevail on the merits of her claim that Medical Mutual's denial of benefits was arbitrary and capricious, the Court also finds that plaintiff would be unlikely to prevail on her claim even if the Blue Cross SPD were the controlling contract document in this case. The Blue Cross SPD defines "experimental/investigational" to include any treatment or procedure "which we do not recognize as accepted medical practice." Every professional journal article that has been presented to this Court concludes that HDC–PSCR is still of uncertain medical value for the treatment of Stage III breast cancer. The journal articles are replete with statements such as: "few data suggest that this approach is superior to standard-dose chemotherapy in either the adjuvant or metastatic setting," and "[a]t this point, a state of 'clinical equipoise' exists."

While it is certainly true in some cases that a "home-run" treatment may produce such dramatic results in phase II studies that phase III results are not required in order to classify the treatment as "accepted medical practice," *see Adams v. Blue Cross/Blue Shield of Maryland, Inc.,* 757 F.Supp. 661, 671 (D.Md.1991), no such showing has been made in this case. To the contrary, all of the evidence before the Court is that there is such substantial overlap between the results obtained by high-dose and standard-dose chemotherapy for Stage II and III breast cancer patients that no significant improvement in patient outcomes has reliably been shown.

 The Seventh Circuit has cogently explained:

The pace of medical science is ever quickening; yesterday's esoteric experiment is today's miraculous cure.... That is noteworthy because at issue here is the point where a treatment which has been experimental in the past crosses the line into

---

11. The several recent reported decisions addressing the HDC–PSCR issue have varied widely. For a more complete discussion of the cases and the disarray in which this area of law currently rests, see William Giese, *Adjudication of Third Party Payment for High Dose Chemotherapy & Bone Marrow Rescue in the Treatment of Breast Cancer,* 1 DePaul J. Health Care L. 205 (1996);

*Courts Continue to Struggle with the Exclusion in Medical Plans for Experimental Procedures: A Review of the Circuit Court Cases Concerning High Dose Chemotherapy as a Treatment for Cancer in Connection with Autologous Bone Marrow Transplant or Peripheral Stem Cell Rescue,* 4 No. 6 ERISA Litig.Rep. 6 (1996).

**1016**

general acceptance—the point at which the medical value of a treatment is no longer generally disputed. Perhaps no such line exists; we are probably dealing more with a zone of perceived effectiveness than a precise dividing line. What is evident, though, and foremost in our minds as we consider this case, is the incompetence of courts to decide when exactly that line or zone has been traversed. Such decisions are judgment calls for medical scientists and health-care professionals, not judges. . . . which is why our standard of review in these cases is highly deferential. To repeat, our narrow duty is to monitor those charged with knowing and deciding these matters for decisions that are patently wrong.

*Smith v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 97 F.3d 950, 956–57 (7th Cir.1996) (upholding denial of coverage for HDC–PSCR for patient with Stage III breast cancer). Where, as in the case at bar, there is widespread disagreement among qualified medical experts over whether the treatment or procedure at issue has crossed the line from being an experimental procedure to become an acceptable medical practice, the reviewing Court cannot hold that the insurer's decision to deny coverage was arbitrary and capricious, even if the Court might have decided the issue differently.

Plaintiff's request for coverage amounts, at bottom, to a claim that defendant is obliged to fund plaintiff's physicians' efforts to "play their best hunch" on the basis of available data from phase II trials. To that plaintiff is not entitled. In the absence of reliable, verifiable studies showing that HDC–PSCR will significantly decrease plaintiff's chances of recurrence, defendant's decision to deny coverage was not arbitrary and capricious. The Court is not without empathy for plaintiff's position. However, it cannot order Defendant to cover an as yet unproven medical treatment where the insurance contract expressly excludes such coverage.

Plaintiff has not shown that she is substantially likely to prevail on the merits of her claim that defendant's determination that HDC–PSCR is "experimental/investigational" for patients with Stage III breast cancer was arbitrary and capricious. Therefore, the first factor of the test does not favor the issuance of a preliminary injunction.

The second issue the Court must address is whether plaintiff has shown that she will suffer irreparable injury if the requested relief is not granted. Plaintiff argues that she has shown irreparable injury because she faces a 50–70% risk of recurrence in the absence of treatment. Defendant argues that plaintiff has not shown irreparable injury because (a) the relief she seeks is monetary in nature; and (b) Plaintiff is presently free from cancer.

The Court agrees with defendant that plaintiff has not shown irreparable harm, although for different reasons than those proffered by defendant. As to defendant's argument that the relief plaintiff seeks is monetary in nature, it is undisputed that plaintiff lacks the funds necessary to pay for the HDC–PSCR treatment and will have to forego such treatment if defendant does not pay for it. Thus, the harm plaintiff will suffer is not a mere monetary loss, but the denial of a medical treatment. As to defendant's argument that plaintiff is presently free from cancer, the Court finds that a 50% chance of recurrence would certainly constitute an irreparable harm, if that harm could be avoided by the provision of HDC–PSCR.

Plaintiff would be able to show irreparable harm if she could show a verifiable improvement in recurrence rates for patients treated with HDC–PSCR over patients treated with standard-dose chemotherapy. Plaintiff's problem, as discussed above, is that there presently is no reliable, verifiable evidence that the treatment plaintiff seeks is any more effective than the standard chemotherapy currently available to her. With standard-dose chemotherapy, plaintiff faces a 40–50% chance of developing metastatic cancer. With HDC–PSCR, plaintiff's chance of developing metastatic cancer is unknown. Plaintiff's treating physician has opined that HDC–PSCR could reduce Plaintiff's chances of developing metastatic cancer to 30–40%, but there are no reliable phase III studies to support his conclusion; and the phase II studies upon which he bases his estimate were small and highly susceptible to selection bias.

As such, plaintiff cannot establish that she will suffer irreparable harm. Therefore, the second factor of the test does not favor the issuance of a preliminary injunction.

The third and fourth factors the Court addresses are whether issuance of a preliminary injunction will cause substantial harm to others and whether the public interest will be served by issuance of an injunction. No showing has been made that the issuance of a preliminary injunction will cause substantial harm to parties not present before this Court, or that the public interest will be served by issuance of an injunction. The parties have largely confined their briefing to the first two factors, and this Court agrees that those first two factors are dispositive of plaintiff's motion.

Since plaintiff has shown neither that she is substantially likely to prevail on the merits of her case, nor that she will suffer irreparable harm if the requested relief is not granted, plaintiff's motion for a preliminary injunction is DENIED.